support centers, field offices, and service centers, there has been a substantial reduction in the backlog. Unfortunately, the agency's redefinition of the backlog obscures the issue and raises questions about its backlog reduction efforts.

**C. Processing Times** – On August 23, 2006, USCIS announced changes that would improve the reporting methodology for processing times of immigration benefit applications. The Ombudsman disagrees that this change provides better information and urges USCIS to return to the practice of providing the public with the actual processing time for each field office.

**D. Customer Service** – During the reporting period, USCIS made important strides in customer service. USCIS increased the number of appointments available via INFOPASS and began two new contracts in the effort to improve its toll-free customer service line. Nevertheless, the Ombudsman continued to observe other areas where communication issues with customers persist: (1) limited customer access to USCIS immigration officers who know about individual cases to resolve an inquiry accurately and efficiently; (2) questionable accuracy of information provided by customer service representatives; and (3) the practice of providing minimal information in response to customer inquiries.

**E. Untimely Processing and Systemic Problems with Employment-Based Green Card Applications** – USCIS' inability to process enough green card applications and accurately track employment-based green card applications has resulted in a perpetual backlog of employment-based green card applications and widespread issuance of interim benefits. This lack of accurate data also has resulted in the underutilization of statutorily limited visa numbers.

**F. Name Checks and Other Security Checks** – FBI name checks, one of the security screening tools used by USCIS, continue to significantly delay adjudication of immigration benefits for many customers, hinder backlog reduction efforts, and may not achieve their intended national security objectives. FBI name checks may be the single biggest obstacle to the timely and efficient delivery of immigration benefits, and the problem of long-pending FBI name check cases worsened during the reporting period.

**G. Interim Benefits** – The Ombudsman strongly supports efforts by USCIS to eliminate the need for interim benefits in favor of timely, efficient, and secure adjudication of the ultimate immigration benefit. Legitimate customers should not have to pay filing fees for interim benefits they would not need if the underlying petition were timely processed. Interim benefits also allow ineligible and fraudulent applicants to receive work authorization and travel documents because of processing delays.

**H. Funding of USCIS** – Due to the congressional requirement that USCIS be self-funded from fees, USCIS may make decisions that compromise operational efficiency to ensure revenue flow. The manner in which USCIS obtains its funding affects every facet of USCIS operations, including the ability to: (1) implement new program and

must rely on only its own resources to continue the backlog reduction effort. This could be particularly problematic if there is comprehensive immigration reform.

The DHS Inspector General's assessment cited in last year's annual report remains true today: "[. . .] reclassifications, as well as the strategy of relying upon temporary employees, may benefit USCIS in the short-term, [but] will not resolve the long-standing processing and IT problems that contributed to the backlog in the first place. Until these problems are addressed, USCIS will not be able to apply its resources to meet mission and customer needs effectively."[20]

The data on pending I-130 petitions for foreign national relatives, the largest component of backlogged benefits applications, illustrate these problems. According to USCIS records, the agency had 1,244,166 pending I-130 petitions through March 2007 of which 818,206 USCIS classifies as "active suspense" cases or those cases excluded from the pending count for calculation of the backlog.[21] The number of active suspense cases has increased about ten percent or over 100,000 additional cases compared to the pending numbers reported in the Ombudsman's 2006 Annual Report (at pp. 18-19).[22]

In its May 1, 2007 Production Update (FY 07, 1st Qtr.[23]), USCIS explains:

> The re-appearance of a backlog is a symptom of the fact that the fees charged by USCIS currently do not recover its full costs. Furthermore, while the temporary subsidy of appropriated dollars ended September 30, 2006, USCIS has not yet implemented the proposed filing fee rule to allow it to fully recover costs and ensure that capacity is sufficient to keep up with demand.[24]

Referring to its redefinition of the "backlog," an updated report stated that "USCIS has implemented 'Active Case Management' (ACM)" and:

> Pursuant to ACM, cases that do not have an available visa or an FBI name check, and cases that are in suspense for other reasons deemed beyond USCIS' control have been taken out of the

[20] Ombudsman's 2006 Annual Report (at pp. 8-9), *citing* DHS Inspector General Report "USCIS Faces Challenges in Modernizing Information Technology," OIG-05-41 (Sept. 2005) at 28; http://www.dhs.gov/interweb/assetlibrary/OIG_05-41_Sep05.pdf (last visited June 3, 2007).

[21] *See* USCIS Production Status Report, Mar. 2007.

[22] "For each application type, USCIS removes from the calculated backlog the total number of pending applications that it is unable to complete due to statutory caps or other bars, including applications where a benefit is not immediately available to the applicant or beneficiary (such as "non-ripe" Form I-130, Relative Alien Petitions where a required visa number is not available, and I-485 cases where the visa number is no longer available due to regression . . ..") USCIS Backlog Elimination Plan, 3rd Quarter FY 06 Update (Dec. 11, 2006) at 1.

[23] USCIS has replaced quarterly "Backlog Elimination Plan" reports with "Production Updates," so-called because the Backlog Elimination Plan was officially retired at the end of FY 06 ("After eliminating the I-485 backlog, and nearly eliminating the I-130 backlog at the end of [FY 06], a backlog for these form types has reappeared . . .." USCIS Production Update, 1st Quarter FY 07 Update (May 1, 2007) at 2).

[24] *Id.*, at 3.

> production queue. This allows USCIS to focus its attention on those cases which are ripe for adjudication.[25]

As stated in the 2006 Annual Report, the Ombudsman remains concerned that such formulations obscure USCIS' continued difficulty to timely process applications and petitions. As further explained below, it is particularly troublesome that USCIS continues to rely upon future applicants to pay for these backlogged cases excluded by redefinition.

In its Response to the Ombudsman's 2006 Annual Report recommendation (AR 2006 – 01), USCIS agreed in principle to provide a breakdown of all incomplete cases by the number of months pending and application type, and stated (at p. 7):

> USCIS is committed to working to develop systems that would give this level of detail to help manage both overall workload and individual cases . . .. Under its Transformation Program, USCIS has already begun a multi-year redesign of its current business environment [which] will give USCIS new operational data and reports, including the type of data described in the recommendation. Given the constraints of existing legacy case management systems, USCIS would today need to perform a cumbersome, labor intensive, recurring manual audit of all pending files in order to compile the suggested data. Such audits would be cost prohibitive.

USCIS states that the constraints of existing management systems prevent it from providing information on discrete processing times of each application. This is in conflict with previous outputs from those systems, which can provide the necessary data. The Ombudsman has observed many USCIS facilities using such data drawn from the three most commonly used systems -- CLAIMS 3, CLAIMS 4, and the Marriage Fraud Amendment System.

USCIS has opted not to use its limited financial resources to extract data from current systems and prefers to spend it on prospective systems that are years in the planning. For example, USCIS has not made corrections to the CLAIMS 3 system to capture data on applicants' priority date information, country of nationality, and the preference category under which the application is filed that USCIS must review before the application is accepted for green card processing. The Ombudsman first raised this issue 42 months ago with senior USCIS leadership and proposed several solutions over that time. Instead of fixing CLAIMS 3 now, USCIS is waiting for the "case management system" it has promised to implement for many years. Failing to correct the system annually results in hundreds, if not thousands, of wasted hours by all levels of USCIS leadership in trying to account for an often asked question by Congress, the Ombudsman, stakeholders, and others: "Exactly how many employment-based green card applications does the agency have pending?" USCIS still cannot answer that question today with certainty.

[25] *Id.*

**Figure 1: USCIS Cases Excluded from the USCIS "Backlog"**

| | March 2007 (most recent final data available) | as of end of September 2006 (end of FY 06 and "backlog" elimination goal) |
|---|---|---|
| **Total – Pending Customer Action** | **137,405** | **150,122** |
| *Customer did not file necessary evidence or material* | 122,608 | 135,155 |
| *Customer failed initial naturalization test and second opportunity was scheduled* | 14,797 | 14,967 |
| **Total – Unripe Due to Limits on Annual Immigration** | **869,544** | **823,439** |
| *Processed applications for green cards that cannot be approved due to annual statutory limits* | 29,303 | 39,121 |
| *I-130 relative petitions* | 799,043 | 710,119 |
| *Asylum-based green card applicants* | 41,198 | 74,200 |
| **Total – Pending Other Agency Action** | **309,791** | **264,262** |
| *No appointment for oath of allegiance is scheduled within month of USCIS decision for naturalization cases where the federal courts have exclusive jurisdiction over the oath* | 2,417 | 1,552 |
| *USCIS is waiting for the investigations requested of other agencies* | 11,879 | 6,879 |
| **Total – FBI Name Check Cases** | **295,495** | **255,831** |
| *USCIS is waiting for FBI name check results for naturalization applicants who have not been interviewed* | 149,003 | 98,764[1] |
| *USCIS is waiting for FBI name check result for otherwise processed cases or interviewed cases* | 146,492[2] | 157,067 |
| **TOTAL – Pending Cases Not Included in "Backlog"** | **1,316,740** | **1,237,823** |

[1] USCIS did not provide this number in its Response to the Ombudsman's 2006 Annual Report, which shows September 2006 data. Consequently, the data point above is from USCIS' November 2006 Production Status Report.

[2] The separate USCIS FBI Pending Name Check Aging Report of May 4, 2007 indicates the pending number of FBI name checks for both green card and naturalization cases has increased to 329,160.

Sources: USCIS Production Status Report (Mar. 2007); USCIS Production Status Report (Nov. 2006); USCIS Response to the Ombudsman's 2006 Annual Report (May 18, 2007), at 4-5.

### 2. Adjudications of Backlogged Cases

From numerous visits to USCIS facilities, the Ombudsman has observed that adjudicators prefer to work on the cases that are easiest to complete. Adjudicators pick the "low hanging fruit" first because supervisors base performance evaluations on the number of cases completed. Consequently, adjudicators put aside the most difficult and time-intensive cases. These cases remain pending, perhaps for years, while backlog reduction appears generally to be succeeding.

The Ombudsman fully supports USCIS efforts to quickly and efficiently complete the cases. However, the current drive to complete large numbers of cases presents problems. For

example, USCIS provides field offices resources based on what is needed to complete a typical case. It is the Ombudsman's understanding that if field offices have a workload of 1,000 cases and USCIS determines each case usually takes one hour to complete, USCIS will provide financial support for 1,000 hours. Cases that take longer than an hour to complete are not provided additional resources in the office's budget. Offices with more than the average numbers of difficult cases or offices that try to work the difficult cases thoroughly will not be adequately funded because the number of completions will be low. Meanwhile, offices that push to complete the easy cases will see their budgets grow. One field office visited by the Ombudsman has a large number of long-pending cases which require substantial adjudicator hours. However, officers at that office indicate that they cannot address the older, difficult cases without negatively affecting their productivity report to USCIS headquarters.

*RECOMMENDATION AR 2007 -- 02*

*The Ombudsman has observed that newer cases are processed more quickly while cases more than six months old are increasingly backlogged. The Ombudsman supports the USCIS drive to maximize case completions, but attention needs to be directed at clearing older cases.*

*The Ombudsman recommends that USCIS provide a clearer picture of the current backlog by providing information on the number of pending cases by form type with receipts that are: (1) less than 90 days; (2) less than 180 days; (3) less than one year; (4) less than two years; (5) less than three years; (6) less than four years; and (7) greater than four years.*

### 3. Backlogged Form I-130 Petitions for Foreign National Relatives

In its Response to the Ombudsman's 2006 Annual Report (at pp. 8-9) and the recommendation (AR 2006 – 03) regarding the timely processing of I-130s, USCIS stated that it is not practical to process them as soon as they are received:

> Where the person will not be able to immigrate within a year due to the overall limits on legal immigration, USCIS' goal . . . is to process the case twelve months ahead of visa availability to ensure that DOS has sufficient time to complete their part of the processing. This process ensures that an eligible person's eventual immigration to the United States will not be delayed by USCIS processing . . ..
>
> USCIS believes having different service levels for different kinds of applications, which reflect relative time sensitivity and risk, while using those with less time sensitivity as a buffer, results in a system that is more cost effective for both USCIS and its customers.
>
> Further, while processing a relative petition immediately, even if the person will thereafter have to wait to immigrate, may appear

were approved. This process would ensure that USCIS does not accept more applications than the number of visas available.

Another issue with priority dates and workloads is connected to the new fee rule. The Ombudsman anticipates that when the new fee rule goes into effect in July, delays in adjudication will significantly impact the agency if it does not track visa information, including visa classifications, priority dates, and country of chargeability. Without tallying cases receipted by visa category, USCIS inevitably will accept ineligible applications and more applications than it can process in the given timeframe. The agency will not collect fees for interim benefits issued for new green card applicants, as the new fee rule requires only one payment for both. In addition, there may be large numbers of retrogressed cases and, eventually, multiple issuances of interim benefits.

As described in the Ombudsman's 2006 Annual Report (at pp. 13-16), the Ombudsman continues to be concerned about USCIS' data integrity and failure to meet its obligation to maintain an accurate count of pending employment- and family-based preference applications. Although the focus is on employment-based visa applications, similar concerns exist for family-based preference cases. The continued collaboration of these agencies supports the Ombudsman's vision of cooperation to provide benefits in a timely and efficient manner.

## F. Name Checks and Other Security Checks

FBI name checks, one of several security screening tools used by USCIS, continue to significantly delay adjudication of immigration benefits for many customers, hinder backlog reductions efforts, and may not achieve their intended national security objectives. FBI name checks may be the single biggest obstacle to the timely and efficient delivery of immigration benefits. The problem of long-pending FBI name check cases worsened during the reporting period.

### 1. Background

As of May 2007, USCIS reported a staggering 329,160 FBI name check cases pending, with approximately 64 percent (211,341) of those cases pending more than 90 days and approximately 32 percent (106,738) pending more than one year.[40] While the percentages of long-pending cases compared to last year are similar, the absolute numbers have increased. There are now 93,358 more cases pending the name check than last year. Perhaps most disturbing, there are 31,144 FBI name check cases pending more than 33 months as compared to 21,570 last year – over a 44 percent increase in the number of cases pending more than 33 months.[41]

[40] *See* USCIS FBI Pending Name Check Aging Report (May 4, 2007). It is important to note that USCIS does not include within its backlog cases pending due to FBI name checks. There are 155,592 FBI name check cases pending more than six months that otherwise may be part of USCIS' backlog. See section III.B for a discussion of USCIS backlogs.

[41] *See id.*

**Figure 10: Pending FBI Name Checks**

| Age of Pending Response | Total Count (May 4, 2007) | Total Count (May 17, 2006) |
|---|---|---|
| < 3 months | 117,819 | 82,636 |
| 3 - 6 months | 55,749 | 33,450 |
| 6 - 9 months | 28,029 | 20,047 |
| 9 - 12 months | 20,825 | 16,845 |
| 12 - 15 months | 14,133 | 15,064 |
| 15 - 18 months | 13,931 | 10,636 |
| 18 - 21 months | 11,035 | 8,144 |
| 21 - 24 months | 12,398 | 8,325 |
| 24 - 27 months | 11,765 | 9,754 |
| 27 - 30 months | 6,600 | 4,435 |
| 30 - 33 months | 5,732 | 4,896 |
| > 33 months | 31,144 | 21,570 |
| **Total Pending** | **329,160** | **235,802** |

During the reporting period, processing delays due to FBI name checks were an issue in approximately 25 percent of all written case problems received by the Ombudsman. Resolving the FBI name check issue is included in the Ombudsman's top five priorities posted on the office website.[42] Unlike FBI name checks, other types of background and security checks – *e.g.*, fingerprint checks, the Interagency Border Inspection Systems name checks (IBIS), and the Automated Biometric Identification System (IDENT) checks – return results within a few days, if not a few minutes. These law enforcement and watch list checks do not significantly prolong USCIS processing times or contribute to the USCIS backlog.

As described in the Ombudsman's 2006 Annual Report (at p. 24), the FBI provides information to USCIS regarding anyone who is the principal subject of an investigation or is a person referenced in a file. USCIS adjudicators and the Fraud Detection and National Security (FDNS) unit use this information to determine if applicants are ineligible for benefits. The FBI provides the name check results at USCIS' request. Name checks are not conducted by the FBI as part of ongoing investigations or from a need to learn more about an individual because of any threat or risk perceived by the FBI. Instead, the name checks are a fee-for-service that the FBI provides to USCIS and according to USCIS-defined standards.

Once USCIS forwards records to the FBI for name checks, the process and the turnaround time for the checks are outside of USCIS' control. Completion of the name check process may take considerable time because manual reviews of FBI files are sometimes required. This review may include FBI reporting on fragments of names of people who are not necessarily central or directly related to an investigation or law enforcement matter. In discussions with the

[42] *See* section VI.F.

Ombudsman, the FBI has stated that it lacks the resources to perform the function in a timely manner.

### 2. Impact of Long-Pending FBI Name Checks on USCIS Customers

The delay caused by the FBI name check has substantial consequences to applicants and their families, as well as to our country and the economy. Examples of how legitimate applicants suffer include:

- Loss of employment and employment opportunities where the position requires green card status or U.S. citizenship;
- Possible termination of employment due to the inability to comply with required Form I-9 employment verification procedures where USCIS delays interim EAD issuance;
- Difficulties obtaining drivers' licenses;
- Inability to qualify for certain federal grants and funds;
- Limitations on the ability to purchase property;
- Difficulties obtaining credit and student loans; and
- Disqualification from in-state tuition.

*CASE PROBLEM*

*The applicant's green card application has been pending since early 2005 due to the FBI name check. The applicant is a valued researcher at a U.S. pharmaceutical company.*

*CASE PROBLEM*

*The applicant's green card application has been pending with USCIS for approximately four years due to the FBI name check. The applicant is a researcher at a U.S. university and, because of the adjudication delay, the university and the individual have been disadvantaged in seeking grant proposals and funding. Specifically, the individual reports that he is currently working on federal research projects. The applicant's inability to advance critical work for the project is a serious impediment to the university, its competitiveness, and the applicant's professional advancement.*

*CASE PROBLEM*

*In fall 2003, an applicant filed a green card application, which remained pending due to FBI name checks until spring 2007. During the course of the adjudication, the applicant was fingerprinted and applied for interim benefits several times. Although the applicant applied for most of the interim benefits in a timely manner, the filing of the last EAD was not timely, and the applicant had to end his employment. In correspondence to the Ombudsman in the winter of 2007, the applicant related that he is a cancer patient who no longer has income necessary to pay for treatments.*

In February 2007, USCIS made public the criteria for expedited treatment of FBI name checks. While this change should help with specific cases, the *status quo* for FBI name check completion is unacceptable from the standpoint of national security and immigration benefits processing.

### 3. Value of the FBI Name Checks

The challenge for USCIS (and perhaps the challenge for DHS and the entire federal government) is to evaluate the value of maintaining the current FBI name check process relative to considerations of threat, vulnerability, and consequence. The Ombudsman agrees with the assessment of many case workers and supervisors at USCIS field offices and service centers that the FBI name check process has limited value to public safety or national security, especially because in almost every case the applicant is in the United States during the name check process, living or working without restriction.

The Ombudsman recommended in the 2006 Annual Report (at p. 25) that the FBI name check process be re-examined. Delays in the name check process actually prolong an individual's presence in the United States while the check is pending. In this sense, the current USCIS name check policy may increase the risk to national security by extending the time a potential criminal or terrorist remains in the country.

In its 2006 Annual Report Response (at p. 10), USCIS stated:

> Although these security checks may require a more lengthy processing time, USCIS believes that performing them is essential to identifying national security and public safety concerns that would not have been uncovered by other means . . . in, a few cases, the information obtained from the FBI through this process has reflected very significant issues and risks. FBI name checks disclose information to USCIS that is otherwise not available. Information contained in 39 [percent] of the FBI positive responses (letterhead memoranda) received in FY 06 was not contained in IBIS/TECS, USCIS' primary background check tool. . .. [A]lthough a heavy price is paid in inquiries, mandamus actions, and other forms of litigation, USCIS is committed to effective

background checks, and thus is committed to the FBI name check. In fact, under the new fee rule currently under review, USCIS proposes to dedicate more funds to the FBI name check process as the FBI has indicated the fees they charge for these checks will increase and additional staff will be added to the process. This should help to speed up the name check process and reduce the backlog significantly.

Use of the 39 percent positive response rate as referenced by USCIS to justify continuing this program may exaggerate the value of the FBI name check. It is unclear how many of the FBI name check "responses" also were revealed by one or more of the other security checks conducted for the applications. To date, the Ombudsman has been unable to ascertain from USCIS the total number of actual problem cases that the agency discovered exclusively as a result of the FBI name check. The Ombudsman understands that most, if not all, of the problem cases which would result in an eventual denial of benefits also can be revealed by the other more efficient, automated criminal and security checks that USCIS initiates.

*COMMENTS FROM OMBUDSMAN'S TELECONFERENCE*

*One caller mentioned that USCIS does not schedule applicants for interviews because security clearances are not yet completed. He suggested that USCIS needs to look at the cost-benefit of doing these clearances. The caller stated he is in the military and has a top secret clearance.*

*Another caller suggested that information could be sent every "X" number of months to the applicant or attorney that the application still is held up for pending name checks, which would avert the many update requests.*

### 4. Possible Solutions to the FBI Name Check Delays

During this and previous reporting periods, the Ombudsman had numerous meetings with USCIS leadership on FBI name checks and discussed a number of solutions to the name check logjam.

#### a. Pre-Application Security Checks

A possible solution to the name check problem is pre-application security checks. USCIS has not chosen to implement such a process, which would dramatically impact the agency's revenue stream for a short period of time. Simultaneously, USCIS is failing to make basic changes to its processing methodology to reduce fraud and ineligible applicants. Instead, USCIS continues to substantially fund a process with questionable value. USCIS maintains that the name check process is of value, but it remains unclear whether the process has added any additional value over the security processes already in place.

**Figure 11: Ombudsman's Suggested Pre-Application Security Check Process**

## Pre-Application Process[1]

**1. PROCESS INITIATION[2]**

- Applicant/Petitioner registers intent electronically
- Individual pays Pre-Clearance fee
- Individual submits to fingerprinting, photographing, medical screen/review, DNA collection (if necessary) and financial review
- Naturalization tests (if necessary) are administered
- File created/located/obtained

[redacted]

Visa available. Proceed to Step 2.

**2. BIOMETRIC/BIOGRAPHIC DATA SHARE[3]**

- Biometric and biographic information is shared with law enforcement and other appropriate agencies/offices for security/public safety risk determination
- Medical information is reviewed to determine health risk determination
- DNA material sent for testing to establish claimed relationships
- Financial documents reviewed/verified
- Results from checks/reviews returned for consolidation into a Clearance Report

**3. CLEARANCE**

- Clearance Report is issued
- Clearance Report will establish eligibility in security, criminal, health, financial, and immigration history areas
- Clearance Report will contain DNA test results (if required)
- Clearance Report will authorize an applicant to proceed to the USCIS application process
- Clearance Report will be available online for interested law enforcement and intelligence entities
- Copy of Clearance Report provided to Applicant

**Pre-Cleared Applicant**

- Nonimmigrant – Found Admissible
- Green card applicant – Found Admissible
- Naturalization – Found Eligible

## Application Process[1]

**4. APPLICATION**

- Applicant files electronic application, or
- Applicant appears at USCIS or Consulate
- Application, required documents, and fees are submitted
- Applications not meeting all filing standards are rejected immediately
- Applications by individuals who have not undergone Pre-Clearance process are rejected immediately
- Visa number (if necessary) secured by USCIS or assigned by DOS

**Same Day Interview (if required)**

**5. INTERVIEW**

- Interview to determine whether basis for immigration/naturalization is valid (marriage interview, employment verification, diversity lottery winner, passport review, etc.), admissibility has been established, and/or naturalization tests have been completed satisfactorily
- Decision
- Card/Certificate production order or Denial Notice production order (as appropriate)
- On-site card/certification production and SAME-DAY DELIVERY

**Same-Day Issuance**



Temporary Status/ Employment Authorization (EAD) | Green Card | Citizenship/ Naturalization

1. May be performed in the United States or abroad.
2. Can include individuals applying for nonimmigrant visas or changes of status, individuals applying for immigrant status (adjustment or consular process), refugees, and naturalization applicants.
3. DHS/USCIS will collect and share data through an integrated case (person-based) management system. A component of this system will be an immigration case management system.

Figure 11 outlines the security screening steps to clear an applicant prior to interview, where necessary, and for adjudication of the immigration benefits application. The applicant/petitioner would register intent and pay a fee to cover the costs of the process. Pre-application is more than a pre-screening that determines *prima facie* eligibility. It moves the case to an adjudicating officer who reviews the file and interviews the applicant, if necessary. Since all fingerprints, biometrics, security clearances, necessary documents, medical evaluation, financial support, and visa availability are cleared, the applicant can be processed to conclusion immediately after interview. A Clearance Report is documentary proof that the applicant successfully completed the pre-application process. This process would place biometrics capture and security screening in the hands of appropriate law enforcement/contract employees, trained in the pre-screening process, and the determination of eligibility for benefits in the hands of USCIS officers trained in immigration law.

The agency also should review the DHS resources available to assist in exploring options to solve the backlogged FBI name check process. A number of DHS law enforcement entities perform security checks similar to those performed by USCIS.

### b. USCIS Background Check Service IT System for Tracking FBI Name Check Cases

USCIS' 2006 Annual Report Response (at p. 10)indicates that the agency's planned Background Check Service (BCS), a new IT system that will track the status of background and security checks for pending cases, was to be implemented in late April with deployment beginning in May 2007. As of this writing, the BCS is not yet deployed. Currently, USCIS has limited capability to produce reports detailing the status of long-pending FBI name check cases. In addition, USCIS systems do not automatically indicate when a delayed name check is complete and the case can be adjudicated. Often, this leads to a situation where the validity of other checks expire before USCIS reviews the case. Those other checks then need to be reinitiated, adding financial and time costs for applicants and USCIS. The Ombudsman fully supports the expeditious rollout of the BCS system.

### c. A Risk-Based Approach to FBI Name Checks

Name checks do not differentiate whether the individual has been in the United States for many years or a few days, is from and/or has traveled frequently to a country designated as a State Sponsor of Terrorism, or is a member of the U.S. military. Many individuals subject to lengthy name checks are either already green card holders or have been issued Employment Authorization Documents (EADs). These documents allow them to receive Social Security cards and state drivers' licenses. Most green card applicants are also eligible to receive advance parole enabling them to travel outside the United States and return as long as their cases are pending, which can be for many years under the current process.

*CASE PROBLEM*

*In early 2006, the applicant applied for naturalization. USCIS informed the applicant that the application is pending due to the FBI name check. The applicant currently is a contract employee for a federal agency and was security screened prior to beginning that employment.*

*CASE PROBLEM*

*The applicant's green card application was filed in early 2004. The application remains pending due to the FBI name check. The applicant previously served as a security officer at a U.S. embassy and was subject to rigorous security screening for the position.*

In November 2006, Secretary Chertoff discussed a risk-based approach to homeland security threats, vulnerabilities, and consequences:

> [T]he core principle that animates what we do at DHS . . . is risk management. It is a recognition of the fact that management of risk is not elimination of risk. There is no elimination of risk in life, and anybody who promises every single person protection against every threat at every moment in every place in the country is making a false promise . . .. What we do have to do is identify and prioritize risks -- understanding the threat, the vulnerability and the consequence. And then we have to apply our resources in a cost-effective manner, using discipline and common sense in order to minimize the risk without imposing undue cost on our communities and our families.[43]

Despite Secretary Chertoff's continuing emphasis on risk management, USCIS performs FBI name checks without the benefit of risk management modeling. In recent visits to USCIS field offices, a number of leaders have questioned the usefulness of the FBI name checks citing some of the same concerns discussed here. The process is not working and consideration should be given to re-engineering it to include a risk-based approach to immigration screening and national security. The U.S. Government Accountability Office recently noted in a report that "[w]hile the Secretary of DHS has expressed a commitment to risk management, DHS has not

[43] DHS Secretary Michael Chertoff, Prepared Remarks at the 2006 Grants & Training National Conference, Washington, D.C. (Nov. 28, 2006); http://www.dhs.gov/xnews/speeches/sp_1164738645429.shtm (last visited June 3, 2007).

performed comprehensive risk assessments in . . . immigration and customs systems to guide resource allocation decisions."[44]

Every effort should be undertaken to identify and remove persons who pose threats to the United States, which would include rescinding immigration benefits after USCIS has granted them. It would be irresponsible for law enforcement entities to stop their investigation of a potential crime merely because the person who is the subject of their investigation has obtained a green card or U.S. citizenship. Similarly, it would be illogical to think that delaying issuance of a green card or U.S. citizenship will prevent a criminal from committing a crime. Considering the protection the FBI name check provides, the cost of government resources used, and mental and actual hardships to applicants and their families, USCIS should reassess the continuation of its policy to require FBI name checks in their current form.

*RECOMMENDATION AR 2007 -- 06*

*In addition to the Ombudsman's recommendation in the 2006 Annual Report, AR 2006 –04, the Ombudsman recommends that USCIS: (1) evaluate the value of the name check in its current format and establish a risk-based approach to screening for national security concerns; (2) work with the FBI to provide the necessary resources to perform name checks in a timely manner; and (3) provide greater transparency to customers by publishing monthly the number of long-pending FBI name check cases.*

## G. Interim Benefits

The Ombudsman strongly supports efforts by USCIS to eliminate the need for interim benefits in favor of timely, efficient, and secure adjudication of the ultimate immigration benefit.

### 1. Background

Generally, USCIS issues interim benefits – EADs and advance parole documents (international travel documents) – to individuals who have green card applications pending with the agency for over 90 days.[45] The Ombudsman is encouraged by constructive dialogue with USCIS during the reporting period that addresses funding and security issues related to the processing of interim benefits.

On May 30, 2007, USCIS established new filing fees for immigration benefits.[46] Under the new fee schedule, USCIS will charge a single fee for green card applications to include recovery of the processing costs for interim benefits. The Ombudsman supports this approach to

[44] U.S. Government Accountability Office Report "Homeland Security: Management and Programmatic Challenges Facing the Department of Homeland Security," GAO-07-398T at 2 (Feb. 2007); http://www.gao.gov/new.items/d07398t.pdf (last visited June 6, 2007).

[45] *See* 8 C.F.R. § 274a.13(d).

[46] *See* "Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule," 72 Fed. Reg. 29,851 (May 30, 2007); *see also* section III.H.1.

cost recovery. By combining the two fees, USCIS mitigates its dependency on fees from interim benefits and eliminates the appearance of the agency prolonging processing times of the primary benefit application to collect fees on interim benefits.

Figure 12 shows that interim benefits accounted for approximately 18 percent of all USCIS revenue in FY 06. Currently, USCIS must dedicate resources to the adjudication of interim benefits, rather than focus on green card and other benefits processing. A cycle of delays and fees has developed to the detriment of customers and USCIS alike.

EADs confer many of the privileges that the green card provides, including permission to work in the United States and ability to obtain other federal and state forms of identification such as Social Security cards and drivers' licenses. These documents enable an individual to secure property and obtain credit in the United States. They also legitimize the individual's presence in the United States, although legal status is not yet fully determined. It is not uncommon for individuals to receive EADs for years, only to have the green card application eventually denied. In fact, applicants who know they are ineligible for green cards may rely on the continuation of a backlog to obtain the EAD, which allows them to live and work in the United States legally for months, if not years.

### 2. Thousands of Ineligible Green Card Applicants Continue to Receive EADs

In 2004, the Ombudsman recommended an up-front processing model that would eliminate the need to issue EADs in many instances.[47] USCIS implemented a pilot program to test a version of this model, which became known as the Dallas Office Rapid Adjustment (DORA) program. As discussed in section IV of this annual report, the Ombudsman strongly supports the expansion of the DORA program or a similar up-front processing model that would eliminate the issuance of interim benefits to most ineligible applicants.

During the reporting period, the DORA data reflected similar approval and denial rates as in the 2006 reporting period.[48] Unfortunately, USCIS has been unable to provide accurate and complete data on the exact number of interim benefits issued nationally to green card applicants. In the 2006 Annual Report, the Ombudsman estimated the data, but is not including these data for this reporting period as the DORA program continues to perform as in 2006 and nationwide denials continue to be significantly higher. Consequently, there are tens of thousands of green card applicants who continue to receive EADs even though they eventually are deemed ineligible for the green card.

## H. Funding of USCIS

The USCIS funding structure is one of the principal challenges to efficient and timely delivery of immigration services. The manner in which USCIS obtains its funding affects every facet of USCIS operations, including the ability to: (1) implement new program and processing initiatives; (2) begin information technology and other transformation efforts; and (3) plan for

[47] *See* sections IV and V.27.

[48] *See* Figure 14.